POST PUB. CO. v. PECK.

(Circuit Court of Appeals, First Circuit. August 9, 1912.)

No. 950.

1. TRIAL (§ 251*)—INSTRUCTIONS—ISSUES.

In an action for libel based on a newspaper article, containing pictures, referring to plaintiff and a book written by him, where the answer did not attempt to justify in a common-law sense by alleging the truth of the words spoken, but the defense was that the article was published in good faith and was fair and reasonable comment and criticism, and the action was tried on the issue raised by the answer, the court properly submitted the case as one in the nature of an action on the case for injuries, involving as the vital issue the question of reasonable or unreasonable press comment, rather than one of strict libel.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec. Dig. § 251.*]

2. TRIAL (§ 251*)—INSTRUCTIONS—CONFORMITY TO ISSUES.

In such case instructions as to the necessity of proof of special damages as a basis of the right to recover general damages, if such instructions were conceded to be necessary in actions of strict libel, were inapplicable to the issues tried, and were properly refused, and the instructions given in accordance with the general rules of damages in tort cases were admissible and sufficiently favorable to the defendant.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec. Dig. § 251.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. **APPEAL AND ERROR (§ 1050\*)—REVIEW—ADMISSION OF EVIDENCE.**

 A judgment will not be reversed because of the admission of incompetent or irrelevant evidence unless it fairly appears to have been prejudicial.

 [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4153–4160, 4166; Dec. Dig. § 1050.\*]

4. **LIBEL AND SLANDER (§ 107\*)—MENTAL SUFFERING—EVIDENCE.**

 In an action for libel in which mental anguish is a proper element of damages, evidence that plaintiff had a wife and sister was admissible.

 [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 299–303, 305; Dec. Dig. 107.\*]

5. **APPEAL AND ERROR (§ 971\*)—WITNESSES (§ 267\*)—REVIEW—CROSS-EXAMINATION OF WITNESSES.**

 Limitation upon cross-examination on the ground that it is not germane to the examination in chief, on the ground that it is too extended even if it relates to matter brought out on examination in chief, or on the ground that it is remote in respect to subject-matter or time, is within the discretion of the trial judge and not reviewable on writ of error, except in cases of extreme and extraordinary exercise of discretion.

 [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3852–3857; Dec. Dig. § 971;\* Witnesses, Cent. Dig. §§ 923–930; Dec. Dig. § 267.\*]

6. **LIBEL AND SLANDER (§ 107\*)—DAMAGES—EVIDENCE.**

 On the question of damages in an action for libel, evidence of plaintiff's standing in his profession and his capacity to earn money therein is admissible.

 [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 299–303, 305; Dec. Dig. § 107.\*]

In Error to the Circuit Court of the United States for the District of Massachusetts.

Action at law by Harry Thurston Peck against the Post Publishing Company. Judgment for plaintiff, and defendant brings error. Affirmed.

James Thomas Pugh, of Boston, Mass. (Elder, Whitman & Barnum, on the brief), for plaintiff in error.

Clarence A. Barnes, of Boston, Mass. (Charles D. Francis, on the brief), for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. This is an action of tort for alleged libel based upon a publication in the Boston Sunday Post of July 24, 1910, which has reference to a book written by Prof. Harry Thurston Peck, and published by Dodd, Mead & Co.

The alleged harmful matter consists of words, pictures, and drawings.

[1] The defense in this case, as finally defined, was not what is called justification, in the strict sense of the ordinary libel suit, but one based upon a denial of malice and of the innuendoes and an assertion that the publication complained of was merely a matter of news published in good faith with reference to legitimate

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

public interests, and that what was done only involved reasonable comment and criticism and as such was privileged.

The plaintiff in his declaration proceeded upon the idea that the printed words and the things done were libelous, and that what the Post said about Mr. Peck and his publication, together with what was brought in about the woman Quinn, her breach of promise case, and what she said about the book in question and its author, and what was done by the Post's staff of authors and artists, taken altogether, operated to bring the book, Mr. Peck, and his other literary works into disgrace and ridicule, and under such circumstances as to entitle him to recover damages.

According to the record, the plaintiff, at the time of the alleged wrongful publication, had for a long time sustained important relations with Columbia University, was a professor in the classics, had written and published several books and many magazine articles, was at the time of the alleged libel engaged upon a "History of Classical Philology" for the Macmillan Company of New York and London, upon a number of articles and reviews for magazines, under contract to become the literary editor of Smith's Magazine, under contract with the American Philological Association to write a series of articles on pure literature in Europe and America, and under contract with the trustees of Columbia University to lecture as Anthon professor of Latin; and it is alleged that by reason of the wrongful publication he suffered financial loss, injury to personal and professional reputation, and was subjected to mental anguish.

It is quite true the plaintiff in his declaration, in speaking of the publication as a whole, characterizes it as a malicious libel, and alleges that the defendant in publishing and circulating the statements and pictures in question intended to convey and did convey the idea that the outline of a head, which included obscene pictures, was the outline of the plaintiff's head, and that the plaintiff was a licentious person, and a moral pervert with a degenerate mind.

But the answer does not put the defense upon the common-law ground of justification through alleging the truth, but upon the ground of the right of justifiable, legitimate, fair, and reasonable comment.

And it thus follows that, while the declaration was one of libel, the whole situation was practically changed by the answer, which presented substantially different issues and substantially different questions from those existing in the ordinary common-law libel suit, and it is apparent that the presiding judge in the last analysis wisely submitted the case to the jury on the lines of common sense instructions, not only practically and legally applicable to the substantial issues involved, but upon such general and comprehensive lines as, under the particular circumstances, were necessary for the proper determination of the real questions at issue, and, the case being exceptional in the sense that the actual question under the answer and upon the trial was in substance one of fair criticism and reasonable comment rather than one of strict libel, it

seems not out of place to set out pretty fully the way in which the case was finally submitted to the jury, to the end that, further on, the importance or lack of importance, the applicability or inapplicability, of the various points raised in the course of the trial may be better understood and appreciated.

The learned judge, after reminding the jury that it was the province of the court to state the law, and that the questions of fact involved would be passed upon by them, proceeded to explain the questions of fact which they were to determine under the peculiar circumstances of the case before them, and among other things said:

"It is my duty to submit to you the questions of fact upon which you are to pass, to point them out to you, and to give you such instructions regarding the law as may be necessary to enable you to arrive at a verdict. This I will try to do, using as few and as simple, words as possible. It will, in view of the length of the trial, however, be inevitably necessary for me to occupy some little time. * * *

"This, gentlemen, as you know, is what is called a suit for libel, in which the plaintiff complains of damage done by the defendant to his reputation. He complains of injury to reputation, personal or professional reputation. I need not dwell upon the fact, so well realized by every one of you, that to every man his reputation is of value. Anything wrongfully done, which tends to injure his reputation, is a wrong which the law will redress. Anything wrongfully done, which tends to make people shun or avoid or have a less good opinion of the plaintiff, or to hold him in contempt or in ridicule, of course it is obvious is an injury to reputation of that general character which the law will redress.

"The plaintiff complains in this case that he has been injured in his reputation, personally and professionally, by a publication made in the Boston Post which has been shown to you, and which has been read to you, the Boston Post of Sunday, July 24, 1910. There is no dispute in this case that the article of which the plaintiff complains was published by the Post, published in the Sunday issue of July 24, 1910. There is uncontradicted evidence as to the number of copies of that Sunday paper circulated. It is undisputed that the article of which the plaintiff complains referred to a book called The New Baedeker, to which frequent references have been made before you. There is no dispute that the plaintiff had, previously to the publication of the Post's article, written and published the book which I have mentioned; and there is no dispute that I have heard that the plaintiff is a literary man by profession, and a teacher, an educator, as it has been called, a professor, a part of whose daily business it is to write books or to write articles.

"Now, the object of this action on the part of the plaintiff is to get compensation in money for injuries which he says this article did to his professional and personal reputation. The damages claimed in his writ are stated to be $100,000; but that, gentlemen, as I may say to you again, is no index of any consequence regarding the amount of damages, if you give any damages, which you should give in this case. The plaintiff in a suit is allowed to insert, when he comes to stating the amount of damages which he claims, any sum which he pleases.

"Now, in order to recover in this case, the plaintiff must satisfy you, by fair preponderance of the evidence, that this publication by the Post did in fact cause an injury to his reputation in some of the ways that I shall endeavor to indicate to you. Of course, injuries to his reputation caused by something else do not entitle him to recover in this action against the Post for publishing this article. The plaintiff must satisfy you by a fair preponderance of the evidence that the publication of this article was the cause of an injury to him in his reputation and in his business, before he can expect you to find a verdict in his favor for that, and award him any damages. Now, if you should be satisfied that this publication was the cause of injuries to his reputation, the plaintiff then has the burden of satisfying you what

is a fair compensation in money for the injuries which you find he sustained. That, and only that, has he any right to recover in this case.

"You will find in this article published by the Post, and complained of by the plaintiff here, statements of two kinds. A good deal of what is said in that article, perhaps the most of it, consists of statements about the book supposed to be under criticism; but some of the things in it, as we have heard, are references, not to the book, but directly to the plaintiff himself; and these are complained of, and they need consideration by themselves. In some respects they stand on a different ground from the ground on which the statements made in criticising the book merely rest. Now, I will consider these first. As to them, I instruct you that the defendant, in reviewing books written by the plaintiff, has a right to make only fair, truthful, and reasonable criticism of the book reviewed. It is bound to confine itself to such criticism of the book, and it has no right to make an attack on the plaintiff personally, or on him ·in his profession as an author. I mean that it has no right to make a wrongful attack on the plaintiff personally, or on him in·his profession as an author. If any statements are made directly by a reviewer not based on the text of the book or warranted by it, then those statements are to be tested by the ordinary rules of law applying to libel, and you have to consider as to those statements whether they are libelous statements.

"Let me recall to you briefly what the statements that I am talking to you about are. They are these:

"This article in the Post begins with a passage in italics, put in quotation marks, and followed by the words 'Professor Harry Thurston Peck.' That passage in italics purports to be a quotation from something that the plaintiff has written. There is evidence here, and uncontradicted evidence, that the plaintiff never wrote anything of that kind. If· a newspaper publishes as a quotation from the plaintiff something which the plaintiff never wrote, that of course is a statement that he did write it; and, if the nature of the quotation be such as to make that a statement injurious to the plaintiff's reputation, it is a statement for which you may have the right to award damages. I will refer to that statement merely for the present, as I shall speak of it again in its order.

"The next statement I am talking about is that made in this publication that the plaintiff is an 'ink maniac.' The next one that I shall refer to is the statement that 'he has an almost paranoical desire to write of women when he takes a pen in hand.' The last feature of the article of this kind upon which I shall comment will consist of the so-called portraits and illustrations, and the headlines over the article which the Post published.

"Now, any statements, as I have told you, about the plaintiff which have a tendency to expose him to ridicule, contempt, or disgrace, are things of which he has a right to complain as an injury to his reputation; and the question for you regarding these statements which I have just mentioned is: Were these statements, or were any of them, statements having such a tendency? Do you think, as fair and reasonable men, that the statements to which I have been referring are such as to tend to injure the plaintiff in his reputation? Now, take them one by one and consider that question. Your result upon each of the statements to which I have referred will enter into your verdict. And it is for you to say, regarding each and all of those statements, whether you think they were of such a character as to tend to injure the plaintiff in his reputation.

"Begin with the alleged misquotation. Perhaps it will be worth while, as some days have elapsed, if I read this over:

"'Against the 20th century woman every man should set his face like flint. She is striving for economic independence, and her advanced theories have always borne fruit in the marked distaste for marrying that is growing among men. The cause for this distaste does not lie in man's heartlessness, nor yet in his profligacy, but in the fanaticism and unwisdom of the modern woman.'

"Now, you are to take that in this way, gentlemen: The plaintiff says, 'I never wrote those words'; and the Post has not proved that he did. They are, then, untruly attributed to the plaintiff. What harm has been done to

the plaintiff by having the writing of those words wrongfully or erroneously attributed to him? Has that caused any injury to his reputation? Are you prepared to say that you are satisfied that the tendency of attributing those words to him when he did not write them is such as to damage his reputation?

"The next statement to which I have referred is the statement that the plaintiff was an 'ink maniac,' and the later statement that he has 'an almost paranoiacal desire to write about women when he takes a pen in hand.' Now, you will observe that in that article those two statements are not made on the Post's own authority. The reviewer in the Post does not undertake to say on his own authority that those things are true. He quotes those statements from a certain Miss Quinn, who is referred to elsewhere in the article; but that, gentlemen, makes no difference for the purposes of this case. You may take those statements just as if they had been made on the authority of the Post itself. The defendant is as much responsible in law for publishing that some one else says the plaintiff is an ink maniac and has an almost paranoiacal desire to write about women, as if it had originated those statements; and it does not escape responsibility for them by putting them into the mouth of a third party, and the fact even that a third party made them does not justify the defendant in publishing them. But, holding the Post responsible for those statements just as if it had made them on its authority, how far are you prepared to say that those statements were such as tended to injure the plaintiff in his reputation? Naturally, you will study a little the meaning of the words used before you can judge of that question. You will naturally inquire: What do such words as those mean?

"Now, in interpreting the meaning of words, their ordinary construction and sense must be used, and taken to be their sense, as far as possible. Take these words 'ink maniac.' Standing by themselves I do not believe they need the slightest explanation to any of you. You are all perfectly familiar with the meaning of 'ink' and the meaning of 'maniac.' I may perhaps question, gentlemen, whether you can say with as much confidence that you know what the words together, 'an ink maniac,' mean. Now, I am afraid, moreover, that I have no explanation that I can afford you. I shall have to leave it to you unassisted, in your own good common sense, to say what 'ink maniac' means, and whether calling a man an ink maniac is something that tends to injure him in his reputation.

"The words, to come to the other statement, 'has an almost paranoiacal desire to write about women when he takes his pen in hand'—in that statement I suppose it is safe to say that we all understand that the word 'paranoiacal' indicates mental unsoundness, or insanity of some kind, and more or less permanent in character. That, perhaps, is a word which is not familiar to many persons. My understanding regarding that word, gentlemen, is that strictly speaking it is a technical word, used by what are called alienists, people who have made a study of diseases of the mind. It does not appear from the connection in which the word is used here that the man who used it had any very accurate, close, definite idea of what it did mean. It looks as if he used it because it was a big-sounding word which he thought would have a good effect in that place, without any very definite notion of what he was really talking about. I think we have all noticed that the use of words of that sort is often resorted to by writers in newspapers. But I do think, gentlemen, that we can say that the word 'paranoiacal' does indicate mental unsoundness of some kind, never mind what, and of a more or less permanent character. I submit that to you. You are to make the best you can of that charge. You are to say, gentlemen, whether you think it had a tendency to injure the plaintiff in his reputation.

"Now, there are no other explicit statements, made in so many words in this publication, which I shall refer to. I shall instruct you that there are no other statements in the article which you need consider by themselves as having been made directly of the plaintiff. With one exception the rest of the article seems to me criticism. Of that I will speak presently. There are in the article two statements that this Miss Quinn whom I have mentioned brought a breach of promise suit against the plaintiff. Those statements I shall instruct you you need not consider in this case. The fact that such a

suit has been brought is admitted. The statement therefore was true. The fact that the statement that such a suit had been brought had been widely published elsewhere months before this publication in the Post has also been admitted; and I see no evidence in the case which would warrant an award of damages for the mere fact that the Post republished in this article the circumstance that such a suit as that had been brought. I shall therefore instruct you regarding those two statements that the breach of promise suit had been brought, that you need not consider them for the purpose of awarding damages.

"But, as to all the other statements to which I have made reference, if you are satisfied that these do refer directly to the plaintiff, and do have a tendency to expose him to ridicule, contempt, and disgrace, and to bring him into disrepute, and if you find that his reputation was in fact thus injured by them, then you will be justified in awarding him damages for them, provided he has also proved to your satisfaction that the injuries were such as call for pecuniary recompense, and what the proper amount of money compensation is. Unless he has satisfied you on all those points, as to them your verdict will have to be for the defendant.

"Now, I refer to the so-called portraits, illustrations, and headlines that introduce this article. I think we may say that it is not obvious, taking these by themselves, that they tend to expose the plaintiff to ridicule, contempt, and disgrace. It is true that there is a newspaper portrait—what is called a portrait—of the plaintiff there. It seems to be neither better nor worse than most newspaper portraits, so far as I have observed. That will be a matter for your judgment, gentlemen; I submit it to you. There is a portrait, another so-called portrait, however, of Esther Quinn; and then there is a rude outline of a head, it is not indicated whose, and certain so-called illustrations within the limits of the outline. You must take all that in connection with the printed article; and I say that, if you take those things by themselves, it is not obvious just what they mean, nor just how nor whether they have any tendency to injure the plaintiff. But the plaintiff has undertaken to tell you what those mean, and he must prove to your satisfaction that they have the sense and meaning which he puts upon them. Unless you are satisfied that they do have the sense and meaning which he puts upon them, your verdict should be for the defendant as to them. If he satisfies you also that they have that sense and meaning, and satisfies you also that they had a tendency to injure him, and did injure him, and as to the amount of damages they caused him, then you may find a verdict in respect of them for the plaintiff. The plaintiff says that the defendant, in publishing and circulating such statements and pictures, intended thereby to convey, and did convey, the idea and meaning that the outline of the human head and obscene pictures therein were the outline and condition of the plaintiff's head and mind, and that the plaintiff was a licentious person, a moral pervert, had a degenerate mind, and had an almost paranoiacal desire, that is, an almost insane desire, to write about women.

"Now, gentlemen, the first question for you then is: Do you think those pictures, so called, mean fairly that? If they do not, you have nothing to do with them. The first question for you is to say what they mean, whether they do fairly convey the idea and meaning which the plaintiff claims that they convey. Now, if you find that they do convey the idea and meaning which he attributes to them, and if you further find that he has proved such injury from them to his reputation as deserves compensation in money, you will be justified in a verdict for him to that amount; and, if not, not. In considering that question I suppose you will undoubtedly be considerably influenced by this allegation that the pictures, what they call pictures, are obscene. That is a question for your good judgment as reasonable men. I can say nothing which will assist you in regard to that. I might express my opinion, but you would not be bound by it. The question is one peculiarly for you, about which I ought to express no opinion at all. It is one of those things peculiarly for the jury to settle. Now, give those pictures fair consideration. Give what the plaintiff claims in regard to them fair consideration and see what your opinion is as reasonable men. Do you see anything obscene in what stands there at the head of the article?

"Now, except as I have thus far indicated, gentlemen, you may treat the rest of this publication in the Post as a criticism of the plaintiff's book, a part of which has been read to you, which has been frequently quoted to you during the trial, and which you will have with you in your room when you deliberate on this case. So, regarding the publication, as a criticism of a book published by the plaintiff, the burden is on the plaintiff to satisfy you by a fair preponderance of the evidence either that the defendant published this criticism out of actual ill will toward the plaintiff, out of an actual desire and purpose to injure him, or else that the article exceeds the limit of fair criticism and comment allowed in criticising books. One of those things the plaintiff must satisfy you of by a fair preponderance of the evidence. Otherwise, regarding the article as a criticism, your verdict will have to be for the defendant, on the ground that, as criticism, the article has done him no legal wrong.

"Now, if the defendant published this article out of actual ill will toward the plaintiff, out of a deliberate wish to do him a mischief in his reputation, then what is said about his book in the publication, if you think it is of such a nature as to tend to expose him to ridicule, contempt, and disgrace, the criticism then, whatever it was, becomes something for which he may recover—for any injury actually done to his reputation by it, even if the criticism would have been allowable if there had been no such actual ill will involved in it. Now, what will you say? Was this publication, on the evidence which you have heard, due to any actual ill will toward the plaintiff on the Post's part? You may consider the article itself as a whole, and the arguments which have been addressed to you about it. You may consider the evidence of the Post's employés, Troy and Meloon, who got up the article together. Now, as you have heard, they deny that they had any ill will toward the plaintiff, or any intention to injure him; but they have made, as you have heard, certain admissions as to what they tried to do, meant and planned to do, in laying out the article, and deciding what should be discussed in it, from which the plaintiff has argued to you that, notwith-standing they deny it, they must have been actuated by real, deliberate hostility, by a wish to injure the plaintiff. Now, what is indicated to you by that, on the whole? You may consider all those things which I have referred to in this item; and, gentlemen, you may properly consider also whether or not, as the defendant claims, the review has omitted many references to women found in the book, and toned down certain portions of the book. If you find that that was the fact, you may consider that in deciding whether there was any actual ill will toward the plaintiff. And on that question you may further consider the fact, if you find it to be a fact, that the statements in the review were made, not on the authority of the reviewer, but on the authority of somebody else named in the review.

"If then, without any actual ill will toward Prof. Peck, or any desire to injure him, you find that this publication went further in what it said than fair criticism and commentary on his book, and if, where it went beyond fair comment, you find that it tended to injure him in his reputation by exposing him to ridicule, disgrace, and shame, and if you find proved an actual injury to his reputation of that kind from that cause such as deserves compensation in money, then a verdict for the plaintiff would be justified for the injury done by the criticism in this publication; and, if not, not.

"To determine the question there arising you will have to understand something about the limits of fair criticism and comment upon a book which has been published. How far may anybody who undertakes to review another's book in the public prints go in finding fault? Now, gentlemen, it is my duty to say to you there that the limits of fair comment are by no means narrow. If a man publishes a book, he may be said to invite and to expect criticism. He has no right to complain of condemnation of his book, or ridicule of his book, when honest, if there is anything whatever in his book which in any way justifies the condemnation or ridicule. Anybody is free, under our laws, to publish his honest opinion about the book, abusing it, making fun of it, as he thinks it deserves, providing he does not go beyond what is reasonable in view of the actual contents of the book itself.

"You have by this time had a chance to form a tolerably **good impression**

of the nature of the book. As I have said, you will have the book with you; and, if you desire to make further investigation, you will have plenty of opportunity to do so; but a good deal of it has been read to you, and some of it quoted to you over and over again. You are to remember that the book is not to be judged by a single isolated expression taken out of what goes before and comes after it. That would not be a fair treatment of any writing. You must judge the book, and any topic treated in it, by its fair meaning taken as a whole. And I might say the same thing applies to this publication in the Post. It will not do to pick out any one passage written in criticism of that book, and judge it by itself, entirely separated, isolated, from what goes before and after. You must take the criticism as a whole, just as you must take the book as a whole. A newspaper has a right to publish fair and reasonable comment upon a book, and such publication is not actionable in the absence of actual malice or ill will. The criticism may be severe; it may hold the author up to ridicule if the writing justifies it. If the book contains passages of an offensive or obnoxious character, it may be described with the severity which such passages deserve. In determining what severity or ridicule is justified, the whole book is to be considered, not single passages taken by themselves, separated from the book. If the book contains numerous passages referring to women, the plaintiff cannot complain if that fact is pointed out, and if such comment is made as their frequency and character justify; and you, gentlemen, must say how far the frequency and character of such passages, if you find any in the book, justify what the reviewer said about that. It is only when the writer goes beyond the limits of fair comment that the law of libel applies to it at all. To comment or criticism a very wide latitude is allowed on the grounds of public policy. Free and unrestricted criticism of what is published in the way of books is regarded as a thing for the public advantage. It is good for the public to have the honest opinions of persons who have examined books, and have honest opinions to express about them. Comment, to be fair, must be honest and also relevant. That is, it must really be about something in the book. It must not, under pretense of being about something found in the book, deal with something else entirely outside of the book. Comment is not unfair merely because the critic has failed to see the merits of the book, or because what he writes is in bad taste. If the reputation, or if the pecuniary interest, of the author of a book criticised has suffered in consequence of fair comment, and the criticism has not gone beyond that—suffered in consequence of fair comment merely, not actuated by malice—the person injured can recover no damages.

"Applying these features, gentlemen, you will have to consider those features of the plaintiff's book which counsel on both sides have called to your attention in argument. So far as you are prepared to say that nothing beyond the real truth about the book has been told, the plaintiff has no ground of recovery. If, in summarizing or describing the contents, you find that the defendant told only the truth, the plaintiff has nothing to complain of. If, in arguing on the contents, the arguments seem to you justified by what is in the book, then to that extent you will have to find that the plaintiff has no ground of complaint. Take an illustration: If the plaintiff says in a book, in his own book—says himself in effect—that he does go to the seashore, that he does look at bathing houses, that he does see women coming from bathing houses, or bathing on the beach, he cannot complain of the reviewer saying that he has said so in his book. If that and nothing more has been said of him, he has no right to complain. But if the reviewer in the Post has taken what the plaintiff says in his book on those matters, and has put a construction upon them which they do not fairly and reasonably bear, has said something on that subject which the book does not justify in your opinion, then the limits of fair criticism have been exceeded; if not, not.

"Now, gentlemen, I think that is all that I can usefully say to you regarding fair criticism. You must compare the book and the article in the light of the suggestions I have made; and, if you are satisfied that the Post's remarks did go in the direction of blame or ridicule, beyond anything reasonably justified by the book, according to what I have told you, then to that

extent—to the extent that you find that those limits were exceeded—you may regard the remarks as giving the plaintiff the right to damages; but not to any greater extent. That the criticism of the Post was not at all skillful or competent, or even intelligent; that it was blundering and ignorant, if you think it was so, is not important, except so far as those facts may lead you to believe that the limits of fair criticism were exceeded by the reviewer.

"Now, gentlemen, I have indicated to you the particular grounds upon which you may perhaps find—it will be for you to say—that the plaintiff has satisfied you, by a fair preponderance of the evidence, that an injury was wrongfully done to his reputation. If you are so satisfied as to those things, or any of them, then you will come to the question of damages. If you are not so satisfied as to any of them or as to such of them with regard to which you are not so satisfied, you will not come to the question of damages at all. But I have to assume now, for the purpose of instructing you about it, that you do come to the question of damages. You are not to understand it as any intimation on my part whatever that you will or that you will not. That is a question wholly for you to settle.

"I suppose, for the purpose of instructing you further regarding the rule of damages, that, as to some of these things, or all of them, you have found that the plaintiff has been wrongfully held up to contempt, ridicule, or disgrace by the Post, and that his reputation has suffered from that cause and from no other. What rule are you to follow in awarding damages for an injury like that? I instruct you there, gentlemen, that you are in that case to determine, from all the evidence and circumstances as proved at the trial, what damages ought to be given to the plaintiff, not exceeding the amount claimed. In fixing the measure of damages the jury may take into consideration the mental suffering produced, if any, by the publication of the article or pictures, or both, if they believe from the evidence that such suffering has been endured by the plaintiff, and the injury, if any, to him in his reputation, and the loss, if any, to the plaintiff by diminution of a demand by publishers for his contributions, literature, to magazines and periodicals, caused by the publication of the article and pictures, if they believe from the evidence that such injury and loss had been suffered by the plaintiff. The loss of contracts with publishers, if any, suffered by the plaintiff, and caused by the publication of the article and pictures, if you believe from the evidence that such loss of contracts has been suffered by the plaintiff, and the probable future loss, if any, by the plaintiff by the diminution of a demand by publishers for his contributions to literature, to magazines and periodicals, which the publication of the article and pictures is reasonably calculated to produce, if you believe from the evidence that such future loss will be suffered by the plaintiff.

"I instruct you, gentlemen, that if the plaintiff is entitled to any damages, he can recover only compensatory damages; that is, only such damages, only such amount in money, as you think is a fair and reasonable indemnity for the actual injury that he has sustained. He cannot recover what are called vindictive or punitive damages. No such damages are recoverable in this case. There are cases in which a jury may award damages going beyond actual indemnity, going beyond actual injury, for the sake of punishing the defendant, and marking their sense of the wrong which he has committed. This is not a case of that kind. In this case you will be limited in any award of damages you may make to actual compensation, for an actual injury suffered. The plaintiff, if he recover any damages at all, can recover only such damages as are proved to be due to the article published by the defendant. The wrong done by the defendant must be the efficient cause of the damages sustained in order to hold it responsible therefor. The defendant is not liable for injury to the plaintiff's reputation caused by prior publications of other parties, or by prior acts of other persons. The burden is on the plaintiff to prove the damages directly caused to him by the publication in the Post; and, if the jury are not satisfied on the evidence that the damage was caused by or was due to that publication, they should find for the defendant.

"The jury may consider that the defendant promptly offered to correct, or publish anything which the plaintiff desired, and that the plaintiff scorned the offer, if they find that those were the facts. You have heard, gentlemen,

that after the publication of this article the plaintiff and the defendant had certain correspondence. You have seen the letters. Do the letters indicate to your minds that in good faith the defendant offered the plaintiff to publish anything he desired, and that the plaintiff scorned such an offer? That. is for you to decide. If you so find, you may consider it on the question of damages. The plaintiff is not to be allowed here any damages in reparation which you find that he might equally have had without suit.

"Now, gentlemen, the damages, you will remember, are to be only for injuries caused by this publication, not for injuries from other causes. There is evidence here that some of the damage complained of was due to other causes. You have heard that evidence; you have heard it argued about; and the question is for you.

"The question of damages, in case you reach it, will be one particularly calling for the exercise of your good judgment and your fair discretion. If you should think that what the Post published may have done the plaintiff an injury in his reputation, but not so much of an injury as to inflict upon him any substantial damage in money, that could be indicated in your verdict by an award of nominal damages, $1, or some such sum. Such a verdict would indicate only that you thought the Post had published something which it ought not to have published, but that no real substantial harm had been done to the plaintiff's reputation. You might, of course, find that you thought no harm had been done at all, that his reputation had not been injured in the least; and in that case you would find for the defendant. If you find that an injury has been done, but no substantial damage suffered by it, you can bring in a verdict for nominal damages. Beyond that, in proportion as you find that an injury has been done the plaintiff's reputation, and that from that injury he has suffered a serious damage, to that extent your award should be increased; and, in making your award, you should endeavor to award him what you can, as reasonable men, say is fair and reasonable compensation for any actual injury to his reputation that he has suffered. But in no case should he be awarded more than just, fair, and reasonable compensation for an actual injury done. You are here to do justice, and nothing more, between these parties, fairly and impartially, without showing one of them any more favor than you do the other. Should you make any award of damages, your award should not be indiscreet or unreasonable. It should not be in the exercise of generosity. It should be just what you reasonable men say is fair and reasonable compensation. You are to view this testimony about damages, as you are to view the testimony on all the other points in the case, fairly and impartially, from all sides, and come to the conclusion indicated by the condition in your minds after you have done that.

"Counsel may now indicate to me anything they may wish to indicate. * * *

"Mr. Pugh: Exceptions to what was taken out of the requests at the conference upon the rulings are saved?

"The Court: Yes.

"The Court: One thing more, gentlemen, on this question of damages. The plaintiff desires that I recall to your mind the evidence about the demand the plaintiff had for literary contributions to magazines and periodicals before the publication of this article, and the evidence regarding what demands he had after it. That, as I recall, was fully argued to you by counsel last week. The mere fact that the demand fell off, if it be a fact, does not necessarily prove that the falling off was by reason of this publication in the Post; but, if you can say that it was due to the publication in the Post, then to such extent as you find that it was due to the publication in the Post, it will be proper for you to take it into account on the question of damages.

"At the conclusion of the charge, defendant's counsel stated to the court:

"'It is not necessary, your honor, to go over the matters which we discussed at the conference on our requests?'

"To which the court replied:

"'Your exceptions are saved on all those matters.'"

A careful examination of the declaration as amended, and the answers, and the very comprehensive and careful charge of the presid-

ing judge, make it clear that, while the case upon the declaration was one of libel, it was treated under the defendant's pleadings as one in which the issue of libel was not in practical, or substantial controversy, and as one which, upon the practical issues raised by the answer became something in substance more in the nature of an action on the case for injuries sustained than one of strict libel, and it is apparent that the learned judge did not undertake to direct the course of the trial strictly upon the lines of a common law trial for libel, and when the cause was finally submitted to the jury there was no explanation of the circumstances under which, in the old common-law libel sense, general damages were dependent upon the proof of special damages.

In short, upon the plaintiff's declaration, this was a case of libel; but upon the defendant's answer and the issues actually tried, it became in substance one of reasonable or unreasonable press comment. The plaintiff is not complaining that the cause was tried upon that issue, and the defendant cannot be heard to complain that the rules of damages are less favorable to him under the issue of reasonable or unreasonable comment than under the strict issue of libel or no libel, because he tendered that issue as the one upon which the trial was in substance had, and the one under which the substantial facts in controversy were determined.

This case, in a sense, may be said to be sui generis, because the damaging matter consists chiefly of ingenious, suggestive, and sensational drawings and pictures connecting themselves with printed statements and lines, which were well calculated, through the force of subtle innuendoes, to bring both the book, the author, and his other writings into disrepute under circumstances which would naturally cause mental disturbance and anguish.

The alleged harmful and damaging character of the publication complained of in this case consists in the combination—a combination in which it was designed to avoid the consequences of the strict common-law libel, but at the same time impair the weight of Prof. Peck's authorship and to bring the author into contempt and under the weight of ridicule. The complexity of the harmful publication involving as it did the newer arts, that is to say, something different from alleged libel in cold print, presented a situation where it became necessary for the defendant to depart from the strict technical lines governing trials of the ordinary libel suit. There is a wide difference between the character of the issue of good faith and fair and reasonable comment, and that of a strict issue of libel or no libel, and as a consequence of that particular defense, which became the essential and substantial issue, the character of the trial was changed, and it became necessary for the court to conform the conduct of the cause to such a situation and to put the case upon broader lines than those which obtain under strict libel issues and to adapt the trial to such a common sense course as would permit the case in hand to be presented to the jury under such rulings and instructions as would enable them to deal justly and comprehensively with the situation before them, and under the adoption of such a course the publication, the

book, the pictures, the lines, and the testimony of the witnesses were before the jury upon the question of fact raised by the issues and involved in the right of fair comment.

Neither upon the pleadings nor upon the trial was there any attempt to justify, in the common-law sense of the older libel suit trials, where the truth of the words was proven. Indeed, from the very nature of the words, the lines, and the suggestive pictures, it was a thing impossible to prove the truth or untruth of the combination. From the very nature of things, it was impossible to frame an issue to the end that an intelligent and definite ultimate fact of truth or untruth could be ascertained in a jury trial. It resulted therefore that, as the publication was not susceptible of the test of truth or untruth, the defense, after denying malice, was chiefly, if not altogether, based upon the right to review and make fair comment upon publications, a right based upon the freedom of the press and upon public policy, and it was upon that general line that the case was submitted to the jury.

It is perfectly true that upon the issues raised by the defendant the case became one of fair or unfair comment, and how could there be a better form of trial in a case of this nature, upon the issues raised by the defendant, than one which accords to the publisher the absolute and inalienable right of free and fair comment, and whether the publication be called a libel or some other name which may be invented, through which it may be defined with legal certainty—a trial which raises for the jury a definite question of fact to be determined, namely, the plain and simple question whether the inalienable right has been fairly and reasonably exercised.

A case like this, upon the issues, becomes exceptional and therefore involves no departure from the rules of substance in respect to strict libel, yet upon the pleadings it is made one which requires some departure from the course of trial ordinarily obtaining in strict libel cases, because the substantial issue of fair comment raised by the defendant with respect to the alleged offending matter consisting of a combination of words, and various kinds of suggestive pictures and lines, with subtle and suggestive settings, relieves the case from the peculiar and exceptional rule in respect to damages which obtained under the technical issues of libel or no libel in ancient times.

This case raises the broad issue of fair comment as the sole, essential, and substantial one. Under such an issue, if the jury under proper instructions finds the comment or criticism to be fair, the result operates as a justification as did proof of the truth of words under the old libel system; and if found to be unfair, the right of comment has been wrongfully exercised, and the wrongdoer should respond in damages for the injury he has done. This would be the redress afforded in ordinary tort cases, and whether the wrongful matter alleged is strictly libelous, or whether it is unfair comment, it is founded in tort, and from the nature of the alleged wrong and the character of the issue raised by the defendant, it results that the trial in respect to it must conform more to the forms of a trial in an action on the case, than to the order of trial in a strict libel suit.

There is not now, nor was there ever, any right to pollute the natural waters running through communities; but there is now and ever has been the right of reasonable and beneficial use. The issues in the two instances are naturally and necessarily different, and trials in respect to the two situations naturally proceed upon different lines. In the first instance, the question would be whether it involved the wrongful act, and if it did, whether it could be justified. In the other, the question would be whether an existing right was reasonably exercised. There is not now, nor was there ever, any right of libel; but there is now and for a long time has been the absolute and inalienable right of reasonable and beneficial press comment upon public and quasi public questions, and literary productions, and the question of the reasonableness of comment and criticism being a simple one, why, upon an issue like the one here, should the situation not be emancipated from distracting issues, rather than hampered and confused by peculiar limitations and contingencies like those in respect to special damages which may have had a rightful function in the old action for libel, but no rightful or useful adaptation to a publication like the one in question, where the substantial issue in respect to it is simply an issue of reasonableness or unreasonableness.

[2] The answer denies that the publication was malicious or libelous; denies the innuendoes, and expressly puts the real defense on the ground of reasonable comment and criticism; and during the trial when certain evidence of the plaintiff's writings was offered by the defendant, and the question was raised as to whether they were offered for the purpose of showing the truth of the alleged libelous statement, counsel answered:

"I do not offer it for that purpose. I offer it to show that the article is a fair comment on the plaintiff's publication."

The defendant, under the rule which has sometimes been held to obtain in libel suits, in its brief puts great stress upon the idea that the instructions in this case did not make the proof of special damages the basis of the right to recover general damages, and upon the idea that the instructions were not given in accordance with the definite and limited meaning, which, under the old common-law sense, holds with respect to special damages in actions of libel, and says, among other things, "The learned judge was clearly confused and in error in his conception of special damages," and "not one solitary matter in the whole article was left to the jury on the ground of special damages."

Our conclusion is that, upon the issue raised by the defendant, such a rule of special damages is not admissible in a case like this, and notwithstanding the fact that the instructions did deal with some phases of the article as involving questions of libel, and others as involving the question of fair comment, it still remains from the nature of the publication and upon the real issues raised by the pleadings, the evidence, and the arguments, that the case in substance was one of fair or unfair comment, and as the instructions were full and complete with respect to such an issue, and as the rule of damages given was

the one which should obtain in a case like this, we see no reversible error in what was said about libel. Moreover, there was no exception directed against the instructions in respect to the two phases of the article, the exceptions being to the point that the general damages were not made subject to proper proof of special damages, and that the definition in respect to special damages was not such as obtains in libel suits.

In order to aid the jury upon the substantial lines of fair comment, the learned judge, under broad and cautious instructions, made some allusions to the words "ink maniac" and their meaning, or what the jury might accept as their meaning, and as was done by Judge Coxe in McClure v. Philipp, 170 Fed. 910, 96 C. C. A. 86, in respect to the words "private graft," gave a cautious explanation of the meaning of the more technical word "paranoiacal," which had reference to the phrase in the article complained of, "He has an almost paranoiacal desire to write of women when he takes a pen in hand."

It will be seen by the instructions which have been set forth at large that the trial judge fully recognized and emphasized the right of the defendant without ill will to make a free, fair, truthful, and reasonable criticism of the book under review, even subjecting it to condemnation and ridicule, but explained that that right was not so broad a right as to justify unfair comment or criticism under ill will, or a wrongful attack upon the author personally or professionally, and if the publication or the way the criticism was set forth with illustrations was wrongful and harmful, then the law would afford redress, and the defendant would be answerable in damages. The two phases of the case, that is to say, the supposed harm to the book, and the supposed harm to the plaintiff personally and his business, were stated to the jury carefully and comprehensively. There were no exceptions to the charge save a general exception as to what was taken out of the requests at the conference upon the rulings, and this exception we must view as one altogether too indefinite to entitle it to examination. Still it may well enough be observed, with such examination as we are able to make from what appears in the record, that we discover nothing which works injustice to the defendant, and this is so because we accept the instructions as comprehensively and sufficiently stating the rules governing the right of fair comment, as well as the question of damages in a case like this.

Having given the jury instructions sufficiently favorable to the defendant upon the question of the right of fair criticism, the judge made the right of recovery or no recovery depend upon whether the jury should find that the criticism was fair or unfair, and after cautioning them that they were not to consider the question of damages except upon the particular grounds he had indicated, the judge proceeded to exclude from consideration all questions as to punitive damages, and stated that they must only consider compensatory damages and such as directly flow from the

wrongful act and such as have direct reference to the actual injuries sustained.

There was some reference during the course of the trial to a publication elsewhere at about the same time; but the jury were carefully instructed that they were to consider only such injuries as resulted to the plaintiff through the direct influence of the Boston Post publication in question.

The nature and scope of the instructions upon the question of damages, which cover in substance many of the defendant's requests, and the lack of specific exceptions to the instructions given upon that subject, leave nothing open for consideration in respect to that phase of the case except so far as questions may have been raised through requests previous to the charge.

There were several exceptions having reference to a definition of special damages, which were taken in chambers at some period before the submission of the case to the jury, which it was then expected the presiding judge would give to the jury; but we think the necessity of an examination into the character of such definition was wholly superseded by the course of the trial and the way in which the case was finally submitted. According to the record, in connection with a hearing on demurrer when the subject was under discussion as to whether there could be general damages without proof of special damages, the learned judge made an observation which involved his idea of what special damages were, and during a consultation in respect to requests in the course of the jury trial, but not in the presence of the jury, the court remarked that it adhered to the ruling made when the demurrer was under discussion. But as the case was finally submitted, general damages were not made dependent upon the proof of special damages, and as we think the nature and scope of the instructions on that subject were correct, the incident of the exception in respect to special damages at a former stage of the trial became wholly fictitious and immaterial, or, as said in McClure v. Philipp, 170 Fed. 910–914, 96 C. C. A. 86, "innocuous"; and this is so because an expression of a presiding judge during the course of a trial and during a consultation between the judge and the attorneys aside from the jury, which was not stated to the jury, could have had no influence upon the result. It was simply an incident of the trial not in the presence of the jury, and as the final instructions with respect to damages were in accordance with the rules which under the issues should govern in a case like this, there is no occasion to consider whether the definition of special damages which has sometimes been held to obtain in strictly libel cases was right or wrong.

It is true that, at the conclusion of the charge, defendant's counsel stated to the court, "It is not necessary to go over the matters which we discussed at the conference on our request," and that the court replied, "Your exceptions are saved on all those matters." That was precisely what should have been done in order

that the defendant should have whatever he was entitled to under the circumstances; but the learned judge intended, of course, that they were to have only their rightful status, and stand for what they were worth in view of the instructions finally formulated and submitted to the jury, and it was quite within the province and duty of the court to allow the exceptions to stand, to the end that the appellate court might determine their effect if any upon the ultimate ground upon which damages were finally ascertained.

It is quite true that in strict common-law actions of libel many authorities make general damages contingent upon a particular kind of special damages, yet there are many authorities, like Mahoney v. Charles A. Belford, 132 Mass. 393, Chesley v. Thompson, 137 Mass. 136, Lombard v. Lennox, 155 Mass. 70, 28 N. E. 1125, 31 Am. St. Rep. 528, Bishop v. Journal Newspaper Co., 168 Mass. 327, 47 N. E. 119, Spencer v. McMasters, 16 Ill. 405, Swift v. Dickerman, 31 Conn. 285, and Fry v. Bennett, 4 Duer, 247, which apparently do not recognize the contingency, but, not deciding and, wholly regardless of the question as to how far that principle would be applied under an issue of libel or no libel in respect to strictly libelous matter contained in printed words, leaving its status as it is in that class of cases and quite independent of it, we view the character of the publication, and the substance of the issues in this case, such as to make the supposed rule in respect to special damages under strict libel issues entirely inapplicable, and such as to render the general rules governing damages in tort cases admissible, to the end that results may be reached, and that justice may be done upon simple and practical lines. Holding this view, we think the question of damages was properly submitted to the jury, because so far as we can see the instructions were in accord with the general rules of damages in tort cases and sufficiently favorable to the defendant.

It is only in a very limited sense that the publication was strictly libelous, and that was involved in the question whether certain words within quotation marks were written by Mr. Peck; and this issue upon the trial was one of secondary importance. The important inquiry, therefore, did not in any substantial sense relate to the question as to what language means, or as to what damage would flow from words, and furthermore the question of language so far as it was involved was so interwoven, intermixed, and merged with the art phases, consisting of lines, pictures, and figures, as to render the harm done by the one phase and the other inseparable; and, as a result of such a situation, general damages should not be made contingent upon the proof of special damages, because the substantial question, into which the question of less importance was merged, and the issues upon the pleadings and evidence, taken altogether, presented a case of fair or unfair comment in every substantial sense rather than one of strict libel.

We see no reason, as expressed by Chitty (Chitty's Blackstone, vol. 3, *126, note 12) many years ago, why general damages should be contingent upon proof of special damages, and it is the purpose

of this opinion to point out that, in a case like this, the artificial and groundless rule has no rightful status. The case in substance does not, as we have said, present the question of the meaning of language, nor does it present the question as to the truth or untruth of the pictorial features of the publication; and, while there may be quasi libelous phases, they are, through innuendo, so interwoven, intermixed, and merged with the free and modern art phases, consisting of lines and pictures and figures, as to make the question of truth or untruth indeterminable either by jury or court; and, as a consequence, in order to have a plain, simple, and adequate remedy, the question necessarily must be whether the right of free comment has been reasonably exercised under all the circumstances, and, if not, the redress should be such damages as flow from the wrongful act, and such as are recoverable under the usual rules in the ordinary actions of tort.

The only reason given by Blackstone for requiring proof of special damages as a foundation for general damages is that it should be made to appear that the picture "was understood to be leveled at the plaintiff or that it was attended with any actionable consequences." Blackstone, supra,

And as the rule is now firmly established and thoroughly settled that damages in all tort cases, whether special or general, to be recoverable must be connected with, and have resulted directly from, the harm complained of, there is no longer any reason for the existence of the peculiar rule. As the reason for the old rule of contingency has ceased to exist, it has become one of mere fiction, and, if allowed to interpose itself in a case like this against such damages as are shown to flow from the wrongful act, it would embarrass and hinder rather than promote and further justice. If a man suffers mental anguish by reason of a wrongful attack upon his character, why, on principle, should his recovery for such injury depend upon whether he has lost the sale of a book which had been subscribed for?

During the trial the defendant offered 12 magazine articles of which the plaintiff was the author, and which were published before the Boston Post criticism. Objection was taken, and upon inquiry as to whether they were offered to show the truth of the alleged libelous publication counsel for the defendant said they were not, but that they were offered under the authority of a Massachusetts case and a Massachusetts statute for the purpose of showing acts of the plaintiff which created a reasonable supposition that the matters charged in the alleged libel were true, and also for the purpose of rebutting actual malice. They were excluded as not admissible under the pleadings, and we think properly upon that ground, as well as upon the ground that they were not within the knowledge of the Boston Post at the time the alleged libelous production was given to the public, and therefore could have had no possible effect either in respect to the defendant's actual malice or in respect to his reasonable supposition as to the truth of the alleged libelous matter.

[3] The plaintiff called a witness, who for many years had been connected with editorial work in connection with literary magazines, and who was acquainted with the purchase of manuscripts by magazines, including plaintiff's literature, and who was asked if the effect of the publication would be damaging, and, if the effect was damaging, how long it would last. This was objected to not upon the ground that the witness was not qualified, but upon the ground that the subject-matter was not of a character to become the subject of expert testimony. The plaintiff cites a long line of authorities, some of which tend strongly to sustain the evidence upon the ground that the test of the admissibility of expert testimony is not whether the subject-matter is common or uncommon, or whether many persons or few persons have some knowledge, but whether the witness offered as an expert has any peculiar knowledge or experience not common to the world. But without regard to the strict question whether the evidence was admissible or inadmissible, and assuming for the purpose of disposing of the exception that it was inadmissible, we should feel bound to hold that it was not so far prejudicial as to justify an interference with the result of the trial. It would be perfectly plain to the ordinary man, whether lawyer or layman, that such a publication in connection with its pictorial phases would be seriously damaging to the plaintiff and his literary work.

In Williamson v. United States, 207 U. S. 425, 451, 28 Sup. Ct. 163, 172 (52 L. Ed. 278), while the court was not dealing with the question of the admissibility of expert evidence, but with the broader question of the present latitude of the rules of evidence and the disinclination to disturb the results of trials, because something inadmissible, though not seriously prejudicial or harmful, gets before the jury, it pointed out that:

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be. The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth. The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused.'"

[4] We have to consider another exception which has reference to the proof that the plaintiff had a wife and sister. We see no objection to the proof of such a fact, as the case was tried and submitted upon the idea that the plaintiff was entitled to recover for mental anguish. Such a fact was a legitimate one to place before the jury under proper cautions, because it was proper for the jury to consider whether a man's mental anguish would be en-

hanced by such environment. It was not for the purpose of including the anguish of the wife and sister, but for the purpose of showing that the anguish of the plaintiff was the more severe, and, under the limitations put upon it, it could have had no other effect. Barnes v. Campbell, 60 N. H. 27.

Other exceptions related to the limitation of cross-examination of witnesses.

[5] Limitations upon cross-examination, upon the ground that the matter in hand is not germane to the examination in chief, upon the ground that cross-examination is too extended even if it relates to matter brought out upon examination in chief, or upon the ground that the cross-examination is remote in respect to subject-matter, or in respect to time, are ordinarily treated as within the discretion of the presiding judge, and not reviewable upon writ of error except in cases of extreme and extraordinary exercise of discretion, and we fail to discover any wrongful exercise of discretion in respect to the matters complained of.

[6] We do not agree with the position of the defendant that it was not open to the plaintiff in his affirmative case to show his standing in, and capacity to earn through, his profession, because, under the theory which governed the trial, a theory which is thought to be the right one, the plaintiff's reasonable damages would in a large measure directly and peculiarly depend upon these elements. 2 Greenleaf on Evidence, § 275; Press Pub. Co. v. McDonald, 63 Fed. 238, 11 C. C. A. 155, 26 L. R. A. 53; N. Y. Evening Journal Pub. Co. v. Simon, 147 Fed. 224, 77 C. C. A. 366; s. c., 203 U. S. 589, 27 Sup. Ct. 776, 51 L. Ed. 330; McClure v. Philipp, 170 Fed. 910, 96 C. C. A. 86; Chesley v. Thompson, 137 Mass. 136.

There are other minor exceptions as to admission and rejection of evidence, and as to requests for instructions; but they were made so far immaterial through the lines upon which the case was finally given to the jury as to render discussion here quite unnecessary.

The judgment of the Circuit Court is affirmed, and the defendant in error recovers his costs in this court.